UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KEITH JOHNSON                          :
    Plaintiff,                     :
                                       :
v.                                     :     3:09-cv-240 (CFD)
                                       :
C. WHITE & SON INC.,                   :
    Defendant.                     :

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Keith Johnson, brought this action alleging employment discrimination and retaliation in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen.Stat. § 46a-60 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. Johnson also claims defamation under Connecticut common law. The defendant, C. White & Son Inc. ("C. White"), now brings a motion for summary judgment as to all of Johnson's claims. For the reasons that follow, C. White's motion is granted.

**I.    Factual Background**[1]

C. White hired Johnson, who is an African-American male, on May 19, 2005 as a truck driver. C. White is a Connecticut fuel transportation corporation. At C. White, Johnson delivered petroleum products to C. White's customers. Johnson was an experienced truck driver and, from May 2005 to June 2006, Johnson completed his duties satisfactorily. Johnson received no documented complaints about his work in his first year of employment at C. White.[2]

---

[1] The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties, including depositions. They are undisputed unless otherwise indicated.

[2] Johnson was, however, denied his 2006 first quarter bonus due to poor attendance.

Beginning in June 2006, however, Johnson's job performance declined. For example, on June 10, 2006, Johnson caused a ten-gallon spill of diesel fuel; on November 2, 2006, Johnson did not show up to work after calling to say that he would be late for his shift; on November 6, 2006, Johnson was issued a written warning for tardiness after showing up late for work twenty times in October 2006; and on December 23, 2006, Johnson caused a thirty-five gallon spill of gasoline.[3] As a result of the December spill, Johnson was suspended three days and denied his fourth quarter bonus.

Around January 2007, Johnson claims that he became aware that he was being paid significantly less than similarly situated Caucasian truck drivers employed by C. White. At the time Johnson was hired, Johnson's rate of pay was $19.50 per hour for twelve hours per day. Total compensation for C. White's truck drivers is based principally on the length and number of routes worked. Payroll records reveal that Johnson was neither the highest nor lowest paid driver

---

[3] In the defendant's Local Rule 56(a)(2) Statement (Dkt. # 63-2), Johnson denies or disputes some of this conduct; however, the Court finds that Johnson has not provided sufficient evidentiary support to create a *genuine* dispute of material fact for purposes of surviving summary judgment. First, Johnson denies that he caused a ten-gallon spill on June 10, 2006, and cites to ¶8 of Johnson's Affidavit. Paragraph 8, however, does not discuss the June 10, 2006 spill. Rather, Paragraph 8 of Johnson's Affidavit states that Johnson believed Sean Geel was racially motivated in his actions towards Johnson. Next, Johnson denies that he did not show up to work on November 2, 2006, and cites to ¶¶8, 15 of his Affidavit. As previously mentioned, Paragraph 8 only addresses Johnson's belief that Sean Geel was racially motivated and Paragraph 15 discusses the two deliveries that C. White alleges Johnson missed on March 24, 2008. Paragraph 15 does not mention the November 2, 2006 incident. Johnson also denies that he was issued a written warning on November 6, 2006, for being tardy twenty times in October 2006. Johnson cites to ¶¶8 and 19 of his Affidavit for support. In Paragraph 19, Johnson states that "[o]ther than on perhaps 3 occasions I was never late to work." In contrast to Johnson's vague recollection of his absences, C. White has submitted a document that contains Johnson's actual start times for the month of October 2006, which shows that on eighteen days (not twenty) in October 2006, Johnson started his shift after 6 a.m. Def. Ex. G.

and that he made more than both some Caucasian and African-American drivers at C. White. Johnson complained about this alleged pay disparity on multiple occasions throughout 2007.[4]

Johnson's job performance did not improve in 2007: on February 10, 2007, Johnson "cross dropped" the wrong product[5]; on May 24, 2007, Joe Miller, C. White's safety director, observed Johnson following a truck too closely on a highway in violation of C. White policy; on June 14, 2007, Johnson failed to conduct a required pre-trip vehicle inspection[6]; and on September 24, 2007, Johnson backed his truck into a pole causing an accident.[7] Johnson was denied his second and third quarter bonuses due to the June and September incidents, respectively.

In November 2007, Johnson asked his direct supervisor, Sean Geel, a Terminal Manager at C. White, if he could switch his days off from Tuesday and Wednesday to Saturday and Sunday. Geel denied Johnson's request because Johnson did not have enough seniority for such a request. On December 5, 2007, Johnson told Geel that he believed that he was being denied his

---

[4] In an effort to earn more money, Johnson asked Phyllis Karayanis, a dispatcher at C. White, whether he could start his workday earlier in order to be assigned more routes. Karayanis, however, declined Johnson's request but allegedly gave a Caucasian colleague additional routes.

[5] A "cross drop" is the mixing of two different types of petroleum products (i.e., mixing red-dyed fuel with clear fuel).

[6] All C. White drivers are expected to conduct pre-trip vehicle inspections on a daily basis.

[7] Johnson also denies or disputes some of this conduct in his Local Rule 56(a)(2) Statement (Dkt. # 63-2). Nonetheless, the Court finds that Johnson has not provided sufficient evidentiary support to create a genuine dispute of material fact as to this conduct. Specifically, Johnson denies both that he failed to conduct a pre-trip inspection on June 14, 2007, and that he caused an accident on September 24, 2007, but only cites to ¶8 of his Affidavit which does not discuss either incident.

bonuses and his requests for more hours and for weekends off on the basis of his race or color. Johnson also allegedly informed Geel that he had filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO").[8] In the CHRO complaint, Johnson complained that he was being discriminated against based on his race or color.[9] After filing the CHRO complaint, Johnson asked Geel for more routes. In response to Johnson's request, Geel allegedly told Johnson that "if you don't like it, go some f[] . . . where else."

On December 8, 2007, Johnson caused a second cross-drop. As a result of this second cross-drop, Johnson met with Sean Geel and Alan White on December 17, 2007, to discuss his job performance.[10] After meeting with Geel and White, Johnson received a final written warning that stated, "Improvement in your performance is mandatory and should it not occur you will be terminated as this is your final warning." Johnson was also suspended for one day and denied his fourth quarter bonus. On December 29, 2007, less than two weeks after receiving his final written warning, Johnson received a warning for failing to report a low quantity of oil in a truck he had driven on December 24, 2007.[11]

In the months following Johnson's final warning, Johnson's job performance did not change: on February 22, 2008, and March 1, 2008, Johnson was the only truck driver to call out

---

[8] C. White did not receive Johnson's CHRO complaint, however, until February 19, 2008.

[9] The CHRO issued a release of jurisdiction letter dated October 16, 2008.

[10] Alan White is co-owner of C. White.

[11] In Paragraph 13 of his Affidavit, Johnson denies that it was his responsibility to report this problem with the truck because another driver had driven the same truck on December 26, 2007. The incident report submitted by C. White for December 29, 2007, however, shows that Johnson was the responsible truck driver. Def. Ex. R.

of work due to snow; on February 29, 2008, Johnson delivered the wrong product to a customer and failed to conduct a required post-trip inspection[12]; on March 6, 2008, Johnson caused a spill of home heating oil; on March 24, 2008, Johnson failed to make two scheduled deliveries; on March 29, 2008, Johnson delivered the wrong product to a customer; and on April 4, 2008, Johnson again delivered the wrong product to a customer.[13]

Johnson's poor job performance was costly to C. White. C. White had to hire an outside environmental group to clean-up Johnson's spills and customers complained about Johnson's work. In fact, one customer even asked C. White not to send Johnson on any further deliveries due to his frequent spills. On April 7, 2008, C. White terminated Johnson. Johnson subsequently filed a second complaint with the CHRO on April 30, 2008, in which he alleged that he was wrongfully terminated in retaliation for his prior CHRO complaint.[14]

---

[12] All C. White drivers are expected to conduct a post-trip vehicle inspection on a daily basis.

[13] Once again, in the defendant's Local Rule 56(a)(2) Statement (Dkt. # 63-2), Johnson denies or disputes some of this conduct but fails to provide adequate evidentiary support of his position to create a *genuine* dispute of material fact. First, Johnson does not dispute that he delivered the wrong product on February 29, 2008, but claims that the incident was not his fault—in Paragraph 14 of his Affidavit, Johnson states that Phyllis Karayanis told Johnson to load the type of fuel that he did. Next, Johnson claims in ¶15 of his Affidavit that he never missed two scheduled deliveries on any day while he was employed by C. White, including on March 24, 2008. Despite Johnson's statement, C. White has produced an email from a customer complaining that Johnson did not make a scheduled delivery on March 24, 2008. Def. Ex. Y. Johnson also denies delivering the wrong product on both March 29, 2008, and April 4, 2008, and cites to ¶¶15 and 18 of his Affidavit, respectively. Paragraph 15 of Johnson's Affidavit, however, only discusses the alleged March 24, 2008 incident, not the March 29, 2008 incident. Paragraph 18 of Johnson's Affidavit discusses the April 4, 2008 incident, but only claims that due to racial motivations, Karayanis gave Johnson the wrong instructions.

[14] On October 2, 2008, the CHRO issued a release of jurisdiction as to this second complaint.

## II. Discussion

### A. Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)). Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134. Consistent with this standard, all evidence favorable to the nonmoving party must be credited if a reasonable jury could credit it. Evidence favorable to the moving party, on the other hand, must be disregarded unless a reasonable jury would have to credit it because it comes from a disinterested source and is uncontradicted and unimpeached. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence

presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

B. Discrimination

In Counts One and Two, Johnson alleges that C. White terminated his employment, denied him quarterly bonuses, paid him less than other drivers, and denied his request for weekends off because of his race in violation of the CFEPA and Title VII, respectively.

Both Title VII and the CFEPA make it unlawful for an employer to discriminate against an employee because of the employee's race or color. See 42 U.S.C. § 2000e-2(a)(1) (Title VII); Conn. Gen. Stat. § 46a-60(a)(1) (CFEPA). Claims of racial discrimination under Title VII and CFEPA are analyzed using the same standard. Feingold v. New York, 366 F.3d 138, 157 (2d Cir. 2004) (Title VII); Levy v. CHRO, 671 A.2d 349, 356–57 (Conn. 1996) (CFEPA). Title VII and CFEPA claims in which there is no direct evidence of discrimination are analyzed under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Under the McDonnell standard, to establish a *prima facie* case of discriminatory conduct based on an adverse job action, a plaintiff must show (1) that he is a member of a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. Id.; see Feingold, 366 F.3d at 152. The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005); Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001). Once the plaintiff has established a *prima facie* case, the burden of production shifts to the employer to

articulate "a legitimate, non-discriminatory reason for" the adverse employment action. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). If the employer is able to do so, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action." Id.

The parties do not dispute that Johnson was a member of a protected class, that he was qualified for the position he held, or that he suffered an adverse employment action.[15] Johnson, however, has not presented evidence sufficient to establish an inference of discriminatory intent by C. White.

The only evidence of discriminatory intent that Johnson has submitted to the Court is two alleged remarks that were made by C. White employees: Johnson claims that Phyllis Karayanis referred to one of his African-American colleagues, Richard Tilley, as "black night" and that Joe Byrka, a Human Resources specialist at C. White, told Johnson that he was "the highest paid color in the company." The Second Circuit has found that "all comments pertaining to a protected class are not equally probative of discrimination." Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir . 2007). Specifically, "remarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." Id. Sean Geel was Johnson's supervisor and the evidence shows that Geel was the principal

---

[15] It is an open question whether being denied a request for weekends off constitutes an "adverse employment action." See Guglietta v. Meredith Corp., 301 F. Supp. 2d 209, 215 (D. Conn. 2004) (finding no adverse employment action where employer required an employee to transfer shifts). Because Johnson has not presented any evidence of racial discrimination and does not make out a *prima facie* case of discrimination, as described in more detail below, it is not necessary for the Court to resolve this issue.

decision-maker regarding Johnson's duties at C. White. For example, Geel met with Johnson to discuss his December 2007 cross-drop; Geel was the author of the various written warnings Johnson received; Geel supervised Johnson's attendance; Geel denied Johnson's request for weekends off; and Geel had substantial influence over whether Johnson received his quarterly bonuses. While Johnson alleges that Geel responded with profanity to Johnson's complaint about being denied his request for more hours and more weekends off, Geel's response contains no racial undertone. Neither Karayanis nor Byrka, who made the alleged racial comments, were responsible for the decision to terminate Johnson, to deny Johnson some of his quarterly bonuses, or to deny Johnson's request for more weekends off. As a dispatcher at C. White, however, Karayanis was responsible for assigning routes to truck drivers. Thus, Karayanis was in a position to make the decisions regarding the number of hours Johnson worked. While Johnson claims that Karayanis refused to grant Johnson's request for additional hours and routes, the evidence shows that many African-American drivers at C. White earned more wages than Caucasian drivers. In order to earn higher wages than their Caucasian colleagues, these African-American drivers necessarily must have been assigned longer and/or more routes. Thus, the fact that several African-American drivers were among the highest paid of all drivers at C. White shows that there was no discriminatory intent in Karayanis's denial of Johnson's request for more hours.

As to Johnson's claim that he was paid less than other similarly situated truck drivers at C. White, there is no evidence that gives rise to an inference of discrimination.[16] It is undisputed

---

[16] Johnson's claim that he was paid less than Caucasian drivers is inextricably tied to Johnson's claim that he was denied his request for additional hours based on his race.

that C. White compensates its truck drivers based on the number of hours and routes worked. Thus, the more hours worked, the higher the drivers' pay. Despite Johnson's claim that Caucasian drivers were given more hours and that he was not allowed to work before 6 a.m.,[17] the evidence shows that Johnson was consistently paid more than some truck drivers at C. White, including more than some *Caucasian* drivers. For example, out of C. White's 31 truck drivers in 2006, 12 drivers were paid less than Johnson (9 of whom were Caucasian). Likewise, out of 30 drivers in 2007, 9 were paid less than Johnson (7 of whom were Caucasian). In addition, the evidence shows that C. White did not routinely discriminate against African-American employees. For instance, Andrew Benn, an African-American driver, was the second-highest paid driver at C. White in 2006 and 2007. Thus, even though Johnson's request for more hours was denied, there is no evidence of discriminatory intent by C. White in denying his request. Furthermore, the evidence clearly shows that there was no discriminatory motive in Johnson's pay, as he was paid more than some Caucasian drivers.

Johnson also has not provided any evidence from which a jury could infer discriminatory intent with respect to his termination or the denial of his bonuses. Rather, Johnson also was not the lone driver terminated or disciplined. Since 2006, C. White has terminated five Caucasian males, two African-American males (including Johnson), and one Hispanic male. C. White also disciplined two Caucasian drivers for causing a cross-drop—Allen Johnson was denied a bonus and Dave Matthews was terminated—and issued a Hispanic truck driver a written warning for being late to work nineteen times in October 2006. Finally, C. White denied bonuses to at least

---

[17] Most drivers at C. White, including other African-American drivers, typically began their workday between 3 a.m. and 5 a.m.

three Caucasian drivers from 2006 to 2007, Allen Johnson, Dave Matthews, and Scott Shanks, for performance or safety-related reasons.

In addition, the undisputed evidence shows that C. White took a number of steps before terminating Johnson, including issuing him warnings and suspending him. For example, after being issued a final written warning following his second cross-drop in December 2007, Johnson was the subject of at least four additional performance issues in late 2007 and early 2008. Nonetheless, C. White did not terminate Johnson until nearly five months later. The warnings that Johnson received contained no racial undertones and were strictly tied to Johnson's job performance. In fact, much of the correspondence between C. White and Johnson shows a willingness by C. White to try and accommodate Johnson. For instance, when Johnson was seen driving too closely to a truck on a highway, C. White's subsequent letter to him about the incident simply reminded Johnson of C. White's policies; the letter was not discriminatory on its face and it even referred to Johnson as a "valued member" of the C. White team.

Courts have held that, while a plaintiff does not have to demonstrate conclusive proof of discrimination to withstand summary judgment, a plaintiff must at least produce some definite facts that a jury could infer discrimination from. Norton v. Sam's Club, 145 F.3d 114, 120 (2d Cir. 1998); Toro v. Arnold Foods Co., Inc., 620 F. Supp. 2d 288, 293 (D. Conn. 2009). Johnson's conclusory allegations that the adverse employment actions he suffered were race-based do not give rise to an inference of discrimination. Although Johnson denies being at fault for some of the job performance issues that were attributed to him, he has provided no evidentiary support for these denials. In contrast to Johnson's unsupported affidavit, C. White has presented well-documented support for each of the performance issues that led to the adverse

employment actions taken against Johnson. Thus, Johnson has failed to raise a genuine dispute of material fact as to C. White's alleged discriminatory intent and has not established a *prima facie* case of discrimination. Accordingly, C. White's motion for summary judgment as to Count One (CFEPA) and Count Two (Title VII) is granted.[18]

### C. Retaliation

In Count Three, Johnson claims that C. White retaliated against him after he complained about discrimination internally at C. White and after he filed a CHRO complaint.

Title VII forbids retaliation against an employee for complaining of prohibited employment discrimination. See 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]."). The plaintiff must make out a *prima facie* case of retaliation by presenting "evidence sufficient to permit a rational trier of fact to find (1) that she engaged in protected participation or opposition under Title VII [or the CFEPA], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse

---

[18] Due to the significant amount of conduct that Johnson disputes in his Local Rule 56(a)(2) statement (see FN 3, 7, 11, and 13 of this Order), the Court notes that it would reach the same conclusion even without considering the disputed or denied conduct. Because Johnson has not provided any inference of racial intent, the extent to which Johnson admits or denies the allegations of his job performance do not preclude the Court from entering summary judgment in favor of C. White. Furthermore, Johnson admits that: he caused a gasoline spill on December 23, 2006; that he cross-dropped the wrong product on February 10, 2007; that he followed another truck too closely on the highway on May 24, 2007; that he caused a second cross-drop on December 8, 2007; that he was the lone driver to call out of work due to snow on two occasions in the first quarter of 2008; and that he caused an oil spill on March 6, 2008.

employment action." Cifra v. G.E. Co., 252 F.3d 205, 216 (2d Cir. 2001) (internal quotations and alterations omitted); see Byra-Grzegorczyk v. Bristol-Myers, 575 F. Supp. 2d 233, 248 (D. Conn. 2008) (applying the retaliation standard to both Title VII and the CFEPA). If the plaintiff makes out a *prima facie* case, and the "defendant then points to evidence of a legitimate, nonretaliatory reason for the challenged employment decision, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Cifra, 252 F.3d at 216.

C. White does not dispute that Johnson has set forth a *prima facie* case of retaliation: Johnson engaged in protected activity when he complained internally to C. White of discrimination in January 2007 and when he filed a CHRO complaint in December 2007; C. White was aware of Johnson's complaints; Johnson subsequently was denied quarterly bonuses and was terminated; and Johnson has at least produced some evidence of a causal connection—Johnson claims that Geel responded with profanity when Johnson stated that he believed he was being discriminated against because of his race.

Despite Johnson setting forth a *prima facie* case of retaliation, C. White has provided a legitimate, non-retaliatory reason for denying Johnson his quarterly bonuses and for terminating him. First, Johnson claims that he was denied his fourth quarter 2006 bonus because he complained of racial inequality in January 2007. While the parties dispute when C. White issued the letter denying Johnson's fourth quarter 2006 bonus—before or after C. White complained of racial inequality[19]—there is no evidence that the denial of Johnson's bonus was race-based even if C. White denied the bonus after Johnson complained. Rather, the undisputed evidence shows

---

[19] C. White's letter denying Johnson's fourth quarter 2006 bonus is undated.

-13-

that Johnson was denied his fourth quarter 2006 bonus due to a thirty-five gallon gas spill he caused at a Fasmart. In fact, Johnson admits this in his Local Rule 56(a)(2) statement. Next, the evidence shows that C. White denied Johnson his second quarter 2007 bonus due to Johnson's failure to conduct a pre-trip vehicle inspection that caused his truck to run out of fuel. Johnson was again denied a quarterly bonus for the third quarter of 2007 due to an accident that he caused and for failing to engage the vapor cap on his truck. Johnson claims that, despite these legitimate reasons, C. White's true motive in denying him his bonuses was retaliatory in nature. Johnson, however, has produced no evidence to support such a claim.

The evidence also does not support a finding that Johnson was terminated in retaliation for engaging in protected activity. Johnson was issued his final written warning on December 17, 2007, after causing a second cross-drop, approximately two-and-one-half months prior to C. White officially receiving notice of Johnson's CHRO complaint.[20] Despite receiving this final written warning, Johnson subsequently failed to conduct a pre-trip inspection; Johnson delivered the wrong product to a customer, who then called C. White and complained; Johnson failed to conduct a post-trip inspection; Johnson caused an oil spill while unloading a product; Johnson failed to make two scheduled deliveries; Johnson loaded the wrong product; and Johnson again delivered the wrong product to a customer, who also complained. Given Johnson's poor job performance from the time he received his final written warning in December 2007, until the time that he was terminated in April 2008, C. White has demonstrated a legitimate, non-discriminatory reason for terminating Johnson. Despite the temporal proximity to Johnson's

---

[20] Johnson claims that, despite C. White not officially receiving notice of his CHRO complaint until February 19, 2008, he told Geel that he filed the complaint in December 2007.

filing of a CHRO complaint, Johnson has not produced any evidence from which a reasonable jury could find that C. White's legitimate reason for terminating him was pretextual. See Diggs v. Town of Manchester, 303 F. Supp. 2d 163, 179 (D. Conn. 2004) ("The mere temporal proximity of [the adverse employment action] to [the defendant's] filing of a discrimination charge i[s] not enough, in and of itself and under the circumstances, to support a finding of pretext.").

In sum, C. White's decision to deny Johnson his quarterly bonuses and to terminate him was objectively based on Johnson's work performance. Johnson has not presented sufficient evidence that would permit a rational jury to conclude that the adverse employment actions he suffered were taken in retaliation to Johnson complaining about discrimination at C. White or filing a CHRO complaint. Accordingly, C. White's motion for summary judgment as to Count Three is granted.

### D. Defamation

To establish a *prima facie* case of defamation, the plaintiff must prove that (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement. Cweklinsky v. Mobil Chem. Co., 837 A.2d 759, 763–64 (Conn. 2004) (citing QSP, Inc. v. Aetna Casualty & Surety Co., 773 A.2d 906, 916 (Conn. 2001)).

Johnson's defamation claim is based on alleged statements C. White made to a prospective employer, United Transport, after Johnson was terminated. Johnson, however, has not provided any evidence of the actual defamatory statement made, when the alleged defamatory

statement was made, who allegedly made the statement, or to whom the statement was made. Thus, Johnson has not made out a *prima facie* case of defamation. In addition, C. White has a qualified privilege for its statements because Johnson signed a release allowing C. White to release information to United. See Miron v. Univ. of New Haven Police Dep't, 931 A.2d 847, 854 (Conn. 2007) (holding that employers have a qualified privilege when making employment references that were solicited with the employee's consent). Accordingly, C. White's motion for summary judgment as to Count Four is granted.[21]

### III. Conclusion

Accordingly, the defendant's motion for summary judgment [Dkt # 59] is GRANTED.

SO ORDERED this 22nd day of February 2011, at Hartford, Connecticut.

/s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**

---

[21] Johnson does not oppose C. White's motion for summary judgment on the defamation claim in his memorandum in opposition to summary judgment.